WO

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

A.A., a minor, by and through his mother, Yvette Aday,

Plaintiff,

v.

United States of America,

Defendant.

---

Peter Newhall,

Plaintiff,

v.

Glenn Tate, et al.,

Defendants.

No. CV-11-08188-PCT-GMS
No. CV-11-08191-PCT-GMS
(Consolidated)

**ORDER**

Pending before the Court are several opposing motions. First, Defendant United States filed a Motion to Dismiss for the Lack of Subject Matter Jurisdiction (Doc. 50), to which Plaintiff Aday responded with a Motion for Substitution of Parties (Doc. 65). For the reasons explained below, the Motion for Substitution is granted and the Motion to Dismiss is granted in part and denied in part.

Second, both sides filed motions seeking a determination of whether Defendant Glenn Tate is an employee or an independent contractor for purposes of the Federal Tort Claims Act. Those motions are: Defendant United States' Motion to Dismiss for Lack of Subject Matter Jurisdiction (Doc. 51), Plaintiff Aday's Motion for Partial Summary

Judgment (Doc. 52) which is joined by Plaintiff Newhall (Doc. 54), and Plaintiff Aday's Motion for an Evidentiary Hearing (Doc. 66). For the reasons explained below, the Motion to Dismiss is denied and the Motion for Partial Summary Judgment is granted. Plaintiffs' Motion entitled in part "Alternatively Motion for an Evidentiary Hearing" (Doc. 66) is dismissed as moot because it only sought a hearing in the event that the Court was granting the Motion to Dismiss. The other requests for oral argument are denied because the parties have thoroughly discussed the law and the evidence, and oral argument will not aid the Court's decision. *See Lake at Las Vegas Investors Group, Inc. v. Pac. Malibu Dev.*, 933 F.2d 724, 729 (9th Cir. 1991).

**BACKGROUND**

This action involves claims under the Federal Tort Claims Act ("FTCA") arising out of a school bus accident. On May 19, 2009, Glenn Tate was driving a school bus for the Cibique Community School ("CCS"). The Plaintiffs, Arelano Aday and Peter Newhall, were students riding the bus home when Tate allegedly lost consciousness and control of the bus. The bus ran off the road and crashed, injuring Aday and Newhall.

The claims of some of the other students on the bus were already resolved in another case. *White v. United States*, CV-10-08128-PCT-JRG, 2012 WL 2590764 (D. Ariz. July 5, 2012), appeal dismissed (Dec. 11, 2012). Based on a motion by the United States, this Court consolidated Aday's and Newhall's cases for discovery. (Doc. 22.)

The parties disagree on the employment status of the driver, Tate. CCS is a tribally controlled grant school, and Tate worked for CCS driving a school bus. On August 23, 2007, Tate completed an "Application for Employment" with CCS for a position as a bus driver. (Doc. 51-1 at 37:17–38:10.) CCS's board approved Tate for the position, and CCS documented the approval using a Contracted Services Agreement. (Docs. 51-3; 51-4.) The Agreement stated that Tate was "an independent contractor, not an employee of the school," but Tate never signed the Contracted Services Agreement. (Doc. 51-4.)

Tate began driving a bus in September 2007 and continued to do so until the accident on May 19, 2009. (Doc. 51-1 at 13:4–9.) Tate considered himself to be an

employee. (Doc 53-12 at 82:17–23; 101:6–15.) Tate's direct supervisor testified that he "was not independent at all" and that "[h]e's a school employee." (Doc. 51-1 at 57:6–8; 73:20.) CCS's Director of School Support Services, Irvin Santiago, testified that he "[a]bsolutely" considered Tate to be an employee, treated Tate as such, and believes that Tate understood himself to be a CCS employee. (Doc 53-6 at 7:8–17; 32:16–23; 37:13–38:18.) CCS's Superintendent, Juan Aragon, explained that the Contracted Services Agreements were used "[b]ecause some of the individuals and companies that were hired to provide services are not employees"; however, he also considered Tate an employee from the time Tate was hired "because [Tate] was performing the same services that our regular bus drivers were performing." (Doc. 51-6 at 12:22–13:1; 48:21–49:19.)

CCS provided tools and equipment for Tate to perform his job. CCS provided a maintained bus and paid for its gas and insurance. (Doc. 51-1 at 15:13–17:12.) It also supplied a first aid kit and fire extinguisher, and gave Tate a cell phone to communicate with the school and parents. (Doc. 51-1 at 24:7–23; 23:15–23.) Tate lived far away from the school and kept the bus at his home overnight, but was not allowed to use it for other purposes. (Doc. 51-1 at 24:17–25:6.) After bringing the students to school each day, he used another school vehicle to drive to his home during the day before returning in the afternoon to drive the students to their homes. (Doc. 51-1 at 98:25–100:5.)

CCS supervised and controlled Tate in a variety of ways. CCS established the bus route including approved stops and the pickup and drop off times. (Doc. 51-1 at 17:22–20:25.) His supervisor, Ervin Quay, rode with Tate twice. (Doc. 51-1 at 101:19–102:10.) There was no regular performance review process for drivers but Quay would have ridden with Tate more if there had been complaints or other problems. (Doc. 53-7 at 124:5–126:10.) Quay made sure that Tate was on schedule. (Doc. 51-1 at 14:23–15:1.) CCS required Tate to perform and report daily inspections of the bus and his mileage. (Doc. 51-1 at 35:21–36:14; 70:4–72:5.) CCS required Tate to attend monthly staff safety meetings and provided a policy book and training including first aid and CPR. (Doc. 51-1 at 21:1–8; 23:24–24:16.) CCS monitored his use of the cell phone and when Tate used it

for personal calls and texts CCS made him reimburse the school for the charges. (Doc. 51-1 at 112:25–113:24.)

Tate worked 40 hours per week for CCS and had no other driving jobs. He kept track of and reported his hours to CCS. He was paid an hourly rate of $10 per hour and CCS felt he was eligible for overtime under the Fair Labor Standards Act. (Doc. 51-6 at 51:21–52:3.) After the accident, the school filed a worker's compensation claim for Tate and he received at least $87,257 in benefits from that program which covers Arizona employees but not independent contractors. (Doc. 51-2 at 14:24–15:14; Doc. 53-14.)

CCS had six school bus drivers, and all were classified as employees except Tate and a substitute driver. (Doc. 51-1 at 28:7–29:20.) CCS did not withhold any taxes from Tate's paycheck and reported his income to the IRS as "nonemployee compensation" using a Form 1099. (Doc. 51-5.) CCS did not provide Tate with any employee benefits such as health insurance, retirement, or paid holidays or sick days. (Doc. 51-6 at 16:7–19:18) The bus drivers classified as employees did have their taxes withheld and received such employee benefits. (*Id.*) Those drivers were paid the same rate per hour as Tate, but their payment was handled through the CCS's payroll while Tate's was processed using a different accounting function that required purchase requisitions and orders. There was some difference in the overall compensation because although Tate received the same pay per hour, he was responsible for all applicable taxes and he did not earn leave or medical benefits. Tate's Contracted Service Agreements lasted for three months at a time, while the employees had one-year contracts. (Doc. 51-6 at 21:6–21.) However, after an audit in 2010, CCS stopped using Contracted Service Agreements to hire workers as independent contractors and now only classifies its workers as employees. (Doc. 51-2 at 54:1–12.)

## DISCUSSION

### I. Administrative Remedies and Substitution of Parties

The United States moves for dismissal because of a lack of subject matter jurisdiction based on Yvette Aday's failure to file an administrative claim before

initiating this FTCA lawsuit. "A tort claimant may not commence proceedings in court against the United States without first filing her claim with an appropriate federal agency . . . ." *Jerves v. United States*, 966 F.2d 517, 519 (9th Cir. 1992); 28 U.S.C. § 2675. Yvette Aday does not aver that she personally met that requirement by filing her own claim but argues that her son, on whose behalf she is pursuing this lawsuit, has exhausted his administrative remedies for this claim. Yvette Aday notes that her son, Arelano Aday, is now eighteen years old and requests that he be substituted as the plaintiff in her place in order to pursue the claim on his own behalf. She apparently informed the United States of her intention to move for substitution and it initially indicated it might allow a joint motion to that effect. The United States later withdrew its intent to join but it has not responded to or objected to the Motion for Substitution.

Courts have allowed minors that have reached majority to be substituted in place of their parents when their parents' ability to litigate their childrens' injuries is called into question. *See, e.g.*, *Zachary M. v. Bd. of Educ. of Evanston Tp. High Sch. Dist. No. 202*, 829 F. Supp. 2d 649, 652 n. 1, 2011 WL 5395778, at *1 n. 1. (N.D. Ill. 2011). In *Zachary M.* the minor subject of the suit had reached the age of majority during the pendency of the litigation and the defendants challenged the minor's parents' continued standing. *Id.* "Rather than rule on that challenge, [the court] allowed [the minor] to substitute in as the real party in interest" pursuant to Fed. R. Civ. P. 17(a)(3)). *Id.*

This case was originally filed in the name of A.A., a minor, by and through his mother, Yvette Aday. (Doc. 1.) The Complaint alleges damages claims for injuries to Plaintiff Arelano Aday (*id.* at ¶¶ 12, 14, 16), to Plaintiff Yvette Aday (*id.* at ¶ 13), and to both of them as Plaintiffs (*id.* at ¶¶ 15, 17).

As for Arelano Aday, he appears to have complied with the requirement to file an administrative claim and the United States does not object or otherwise respond to the Motion to Substitute him as the plaintiff in this matter. Although he was referred to throughout most of this lawsuit as A.A. because he was a minor, Arelano Aday has essentially been a plaintiff since this lawsuit was initiated. To the extent that Yvette Aday

was acting as a plaintiff in his place, the unopposed Motion to Substitute (Doc. 65) Arelano Aday as the primary plaintiff in this case is granted. The United States' Motion to Dismiss is denied as to Arelano Aday without prejudice because it does not allege that he failed to file a claim.

To the extent that Plaintiff Yvette Aday is asserting in the Complaint that she has injuries of her own, such as loss of consortium, or that she personally shared in the injury of her son, she has not complied with the requirement to file an administrative claim. Accordingly, the United States' Motion to Dismiss (Doc. 50) is granted as far as it relates to Yvette Aday's personal injuries or her part of any joint injury to the Plaintiffs. Therefore, Yvette Aday is dismissed as a party to this suit.

**II. Tate's Employment Status**

In opposing motions, both sides ask this Court to determine whether Tate was an employee or an independent contractor. The United States moves for dismissal of the case for lack of subject matter jurisdiction because it has only consented to tort claims under the FTCA against it employees and it argues that Tate was an independent contractor. (Doc. 51.) Plaintiffs oppose that motion, and move for partial summary judgment that Tate was in fact an employee and not an independent contractor. In the alternative, Plaintiffs requests that the resolution of the matter should be postponed to trial.

**1. Legal Standard**

Although the ultimate legal issue, whether Tate was an employee or an independent contractor, is the same in either motion, different legal standards govern the United States' Rule 12(b)(1) Motion to Dismiss based on subject matter jurisdiction and Plaintiffs' Rule 56 Motion for Partial Summary Judgment. For the reasons explained below, the Motion to Dismiss is denied and the standards for a motion for summary judgment govern the Court's consideration of this issue.

The government moves to dismiss the petition under Rule 12(b)(1). An attack on jurisdiction under 12(b)(1) can be facial or factual. *Safe Air for Everyone v. Meyer*, 373

F.3d 1035, 1039 (9th Cir. 2004). "In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction. By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Id.* Here, the attack is not facial because the complaint alleges that Tate was an employee. Instead, the United States makes a factual attack on the truth of that allegation.

In a factual attack on jurisdiction, a court may consider evidence beyond the complaint without converting the motion to one for summary judgment. *Id.* The court need not presume the truthfulness of plaintiff's allegations, and the plaintiff must furnish affidavits or other evidence in order to meet its burden to establish subject matter jurisdiction. *Id.*

However, when the court's jurisdiction is based on a federal question, a jurisdictional dismissal is exceptional and may only be granted if it satisfies the requirements of *Bell v. Hood*, 327 U.S. 678 (1946). *Id.* In *Bell* the Supreme Court held that such jurisdictional dismissals are only appropriate when the claim "clearly appears to be immaterial and made solely for the purpose of obtaining federal jurisdiction or where such claim is wholly insubstantial and frivolous." *Id.* (quoting *Bell,* 327 U.S. at 682–83).

The Ninth Circuit has held that courts should not make a jurisdictional finding of genuinely disputed factual issues when the question of jurisdiction and the merits of an action are intertwined. *Id.* They are intertwined when "a statute provides the basis for both the subject matter jurisdiction of the federal court and the plaintiff's substantive claim for relief." *Id.* (citation omitted); *see also Thornhill Publ'g Co. v. Gen. Tel. Co.*, 594 F.2d 730, 734 (9th Cir. 1979) ("[W]hen a statute provides the basis for both the subject matter jurisdiction of the federal court and the plaintiffs' substantive claim for relief, a motion to dismiss for lack of subject matter jurisdiction rather than for failure to state a claim is proper only when the allegations of the complaint are frivolous.").

Here, the motion to dismiss is denied because the question of jurisdiction and the merits of this action are intertwined. The FTCA provides the basis for both of them and

the Court should not make a jurisdictional finding of genuinely disputed factual issue of Tate's employment status in a 12(b)(1) context. This decision is also supported by the fact that there is a pending motion to decide this same issue on the merits. *See Thornhill Pub. Co.*, 594 F.2d at 733–34 ("Although a court considering a motion relating to jurisdiction as well as a motion on the merits generally would decide the jurisdictional issue first, if the attack on jurisdiction requires the court to consider the merits of the case, the court has jurisdiction to proceed to a decision on the merits."). The United States' Motion to Dismiss is denied, and the Court will instead address the issue of Tate's employment status in the context of the Plaintiffs' Motion for Partial Summary Judgment.

Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Substantive law determines which facts are material and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A fact issue is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (quoting *Anderson*, 477 U.S. at 248). Thus, the nonmoving party must show that the genuine factual issues "'can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" *Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987) (quoting *Anderson*, 477 U.S. at 250). Because "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury

functions, not those of a judge, . . . [t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor" at the summary judgment stage. *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)).

Furthermore, the party opposing summary judgment "may not rest upon the mere allegations or denials of [the party's] pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Brinson v. Linda Rose Joint Venture*, 53 F.3d 1044, 1049 (9th Cir. 1995).

**2. Analysis**

The FTCA allows plaintiffs to sue the United States for torts that are "caused by the negligent or wrongful act or omission of any employee of the Government." 28 U.S.C. § 1346(b)(1). "The United States is not liable under the FTCA for the negligence of its independent contractors." *Ducey v. United States*, 713 F.2d 504, 516 (9th Cir. 1983) (citing 28 U.S.C. § 2671); *United States v. Orleans*, 425 U.S. 807 (1976). Here, both parties agree that if Tate was an employee of CCS, the plaintiffs may bring this claim under the FTCA; but that if Tate was an independent contractor, the plaintiffs may not bring the claim. In order to prevail on the Motion for Partial Summary Judgment, the Plaintiffs must establish that there is no genuine dispute regarding any material fact and that as a matter of law Tate was an employee and not an independent contractor.

Federal law determines whether an individual is a federal employee and "[c]ommon law agency principles are also instructive in determining whether one is a contractor or an employee." *Autery v. United States*, 424 F.3d 944, 957 (9th Cir. 2005). Courts may not abrogate the FTCA's independent-contractor exemption and an independent contractor does not become an employee merely because the United States prescribes detailed performance objectives or performs inspections to ensure contactor compliance. *Id.* To be considered an employee, "[t]here must be substantial supervision over the day-to-day operations of the contractor." *Id.* Indeed, the "critical test for distinguishing an agent from a contractor is the existence of federal authority to control

and supervise the 'detailed physical performance' and 'day-to-day operations' of the contractor." *Ducey*, 713 F.2d at 516 (quoting *Orleans*, 425 U.S. at 814–15).

The Ninth Circuit's emphasis on control is consistent with the Restatement (Second) of Agency, which defines a servant as "a person employed to perform services in the affairs of another and who with respect to the physical conduct in the performance of the services *is subject to the other's control or right to control*." Restatement (Second) of Agency § 220(1) (1958) (emphasis added). The Ninth Circuit has also noted that the Restatement goes on to list a nonexclusive set of "matters of fact" that courts can use "[i]n determining whether one acting for another is a servant or an independent contractor." *Id.* § 220(2); *Slagle v. United States*, 612 F.2d 1157, 1160 (9th Cir. 1980). Those factors are:

> (a) the extent of control which, by the agreement, the master may exercise over the details of the work;
> (b) whether or not the one employed is engaged in a distinct occupation or business;
> (c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;
> (d) the skill required in the particular occupation;
> (e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;
> (f) the length of time for which the person is employed;
> (g) the method of payment, whether by the time or by the job;
> (h) whether or not the work is a part of the regular business of the employer;
> (i) whether or not the parties believe they are creating the relation of master and servant; and
> (j) whether the principal is or is not in business.

Restatement (Second) of Agency § 220(2). Additional matters of fact that have also been considered in Ninth Circuit cases include: "no fixed salary on a regular basis, not subject to tax deductions, can refuse the call for assistance, not required to be available at a particular time, and worked under a contract and was paid by voucher." *Slagle*, 612 F.2d at 1160 (citing *United States v. Becker*, 378 F.2d 319, 322 (9th Cir. 1967)).

Here, although a few of the formal factors support the United States' claim that Tate was an independent contractor, the totality of the undisputed facts establish that Tate was an employee as a matter of law. For example, the Unites States emphasizes that the Contracted Services Agreement explicitly states that it is creating an independent contractor relationship, but the United States has not produced any Agreements that were signed by Tate. Furthermore, the testimony of the Superintendent and others indicate that the Contracted Services Agreements was just the form of paperwork they were advised to use even though they always considered Tate to be an employee and treated him the same as the other bus drivers who were classified as employees. Similarly, the fact that Tate was paid through a different system without any tax withholding was only an accounting distinction and does not undermine the master-servant relationship that CCS had with Tate. Significantly, CCS has stopped using Contracted Services Agreements to make this formal distinction between its otherwise equal employees after an audit determined they were being used improperly.

Tate was an employee because under the critical distinguishing test, CCS had the "authority to control and supervise the 'detailed physical performance' and 'day-to-day operations'" of Tate. *See Ducey*, 713 F.2d at 516 (quoting *Orleans*, 425 U.S. at 814–15). The United States seems to argue that CCS had to actively control Tate's daily decisions based on cases which mention a requirement of "substantial supervision," *Autrey*, 424 F.3d at 957 (quoting *Letnes v. United States*, 820 F.2d 1517, 1519 (9th Cir. 1987)). But the test from *Ducey* is that CCS must have the "authority to control and supervise," which is based on the language from the Restatement that Tate must be "subject to the [CCS]'s control or right to control." Looking at these cases together, there is substantial supervision when the employer has the right and authority to control the employee when it chooses to, even if the primary daily supervision involves more monitoring and less active control.

The fact that Tate's supervisor only rode with him twice does not indicate that CCS lacked the necessary authority or right of control and supervision. The supervisor

and CCS had the right and authority to do so more frequently but simply did not do it. The supervisor found it personally inconvenient to ride along with Tate more frequently but clearly indicated that he would have done so if there had ever been any complaints or other issues that needed to be addressed. In summary, the fact that a particular employee, such as Tate, is able to successfully complete his job without constant, daily instruction does not turn that employee into an independent contractor. CCS had the right and authority to exercise whatever style of supervision and extent of control it chose to and that is the critical issue here.

The remaining factors from the Restatement also support the conclusion that Tate was an employee of CCS. Under factor (a), CCS had the authority to control the details of Tate's work. This included setting the route and stop times, tracking the daily mileage driven, issuing a detailed policy manual, requiring Tate to attend regular staff meetings, and even examining his individual phone calls and text messages to ensure that they were work related. Under factor (e), CCS also provided all of the tools necessary for Tate's work including the bus, gas, insurance, safety equipment, and cell phone. Under factor (f), although Tate's Contracted Services Agreement technically lasted only for three month periods at a time, the other employees only had year-long contracts. Tate had been working continuously as a bus driver for almost two years and his contracts were regularly renewed as they expired in the same way as contracts of the other bus drivers who were classified as employees. Under factor (g), he was paid hourly and at the same rate as all of the other bus drivers, rather than by job as a contractor typically is. Although there are technical differences in the way he was paid through requisition orders, he otherwise had a regular forty-hour-per-week job with a consistent income from it. Finally under factor (i), the parties expressed their belief through depositions that Tate was an employee and that they were creating a master and servant relationship. Although the words of the unsigned Contracted Services Agreement do not support this belief, none of the parties seemed to treat that Agreement as defining the employment relationship.

The United States cites several cases that found drivers to be independent

contractors, but all of them are distinguishable from the facts of this case and most of them are not from the Ninth Circuit. The Seventh Circuit concluded that giving a bus driver a set route with stops did not indicate enough control to make the drivers employees, but in that case the drivers supplied their own buses and bid on the routes against other contractors. *E.E.O.C. v. N. Knox Sch. Corp.*, 154 F.3d 744, 745–46 (7th Cir. 1998). Instead of bidding the routes out to contractors, the school districts in that case also had the option of buying their own buses and hiring drivers that were employees in the same ways as its other non-instructional employees. *Id.* That is what occurred here because CCS provided the bus and hired Tate to drive it. A district court opinion cited by the United States that relied on the reasoning in *Knox* similarly involved drivers who "used their own vehicles, paid for their own gas, and paid for maintenance of their vehicles." *Sahinovic v. Consol. Delivery & Logistics, Inc.*, C 02-4966 SBA, 2004 WL 5833528 *1 (N.D. Cal. Sept. 14, 2004). The Seventh Circuit noted that the question of control over a driver will not always be dispositive or easy to determine from the facts, but significantly it also recognized that "'right to control' refers to the right and not to actual exercise of control in any particular circumstance." *Stone v. Pinkerton Farms, Inc.*, 741 F.2d 941, 943 (7th Cir. 1984). The ultimate determination of independent contractor status in *Stone* was based on distinguishable facts including that the driver provided his own truck, trailer, and gas, as well as the parties' belief about the nature of the relationship and the driver's freedom to work for others. *Id.* at 943–45.

The United States also cites *Norton v. Murphy* to support its contention that the explicit independent-contractor language in the Contracted Services Agreement should be a persuasive factor. 661 F.2d 882, 884 (10th Cir. 1981). However, that Tenth Circuit case actually noted that "[t]he intent of the parties, as manifested in their agreement, is, however, just one of many factors to be considered in resolving the sometimes difficult question of whether a party is an employee, or an independent contractor." *Id.* at 884. The Second Circuit accepted the language from a contract that an employee served as an "agent, and not as an independent contractor," but there the parties had identified "no

reason why the agreement should not be accepted at face value on this point." *B & A Marine Co. v. Am. Foreign Shipping Co.*, 23 F.3d 709, 713 (2d Cir. 1994). Here, the Court has considered the Contracted Services Agreement as one of the factors and the Plaintiffs have identified many reasons why the language should not be accepted at face value.

The United States argues that the testimony of Tate's supervisors, who all agreed that they always considered him an employee, "is disingenuous, *at best*." (Doc. 56 at 7.) It argues that the differences in the way Tate was treated from other employees should be used to disregard what the supervisors said. Those differences in the manner of payment and benefits were already considered as factors under the test. The belief of the parties about what kind of an employment relationship they were creating is a separate factor. The depositions all support the conclusion that the parties always thought of Tate as an employee.

Finally, this Court reached the same conclusion, that Tate was an employee of CCS, in another case arising out of this bus accident. *White v. United States*, CV-10-08128-PCT-JRG, 2012 WL 2590764 *4 (D. Ariz. July 5, 2012), appeal dismissed (Dec. 11, 2012). There were additional facts in that case that are not before the Court here, such as the United States' earlier admission in its pleadings that Tate was an employee. *Id.* However, in that case this Court considered many of the same facts before the Court in this matter and reached the same legal conclusion even without considering that admission. *Id.*

In summary, the United States has not shown that there are any material facts in dispute that would preclude partial summary judgment as a matter of law. The parties disagree about the legal significance and weight that should be given to each fact but there is no material dispute about the facts. Therefore, for the reasons discussed above partial summary judgment is granted on the issue of Tate's employment status. The Court holds that Tate was an employee of the government for purposes of the FTCA. Therefore, the independent contractor exception does not apply and this Court has jurisdiction under

the FTCA to hear this claim.

**IT IS HEREBY ORDERED** that Defendant's Motion to Dismiss for the Lack of Subject Matter Jurisdiction (Doc. 50) is **granted in part and denied in part**.

**IT IS FURTHER ORDERED** that Defendant's Motion to Dismiss for the Lack of Subject Matter Jurisdiction (Doc. 51) is **denied.**

**IT IS FURTHER ORDERED** that the Motion for Partial Summary Judgment (Doc. 52) is **granted.**

**IT IS FURTHER ORDERED** that the Motion for Substitution of Parties (Doc. 65) is **granted.** Arelano Aday is now the only plaintiff in case number CV-11-08188-PCT-GMS. The Clerk of the Court is directed to replace his initials, A.A., and to remove Plaintiff Yvette Aday from this action.

**IT IS FURTHER ORDERED** that the Motion for an Evidentiary Hearing (Doc. 66) is **dismissed as moot.**

Dated this 12th day of February, 2014.

G. Murray Snow
United States District Judge